IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 1, 2009

**PATRICK HARRIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 03-01420     John P. Colton, Jr., Judge**

_____

**No. W2008-02186-CCA-R3-PC  - Filed November 2, 2009**

_____

The Petitioner, Patrick Harris, was convicted by a jury of one count of first degree murder. His conviction was affirmed on direct appeal. See State v. Patrick Harris, No. W2004-00469-CCA-R3-CD, 2005 WL 468324 (Tenn. Crim. App., Jackson, Feb. 25, 2005). He filed a timely petition for post-conviction relief. He was appointed counsel and filed an amended petition alleging that he received ineffective assistance of counsel at trial. The Criminal Court of Shelby County denied his petition for post-conviction relief after two evidentiary hearings. He now appeals this denial. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Patrick Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alexia Fulgham, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

On direct appeal, this Court summarized the facts underlying the Petitioner's case:

This case involves the June 8, 2002 death of Lavon Armstrong who was shot in the front yard of his residence located in south Memphis at 728 Lucy Street. The [Petitioner] was arrested, tried for, and convicted of first degree premeditated murder. The [Petitioner] admitted to firing the fatal shot but claimed that he acted in self-defense and in defense of his mother.

The evidence at trial, taken in the light most favorable to the state, showed that the victim, who was 24 years old at the time of his death, lived with his cousin, Lacey Armstrong, and her two sons, Eddie and Laquavious Armstrong. Ms. Armstrong last saw the victim between 11:00 a.m. and noon on June 8, as she was leaving to attend a baby shower. The victim, Ms. Armstrong's sons, and another cousin remained at the house. Later that same day, Ms. Armstrong received notice that the victim had been shot and that her son, Eddie Armstrong, had been injured.

The [Petitioner]'s mother, Earma Harris, testified that she lived nearby at 713 Lucy Street with her son and her daughter, Monica Conley. Monica Conley had dated the victim. On June 8, around noon, Ms. Harris was at Carter's Fish Market; the [Petitioner] and a female companion, Latasha Jenkins, brought keys to Ms. Harris. The [Petitioner] mentioned that he and the victim "had been into it," which concerned Ms. Harris. The [Petitioner] would not explain his remark other than to suggest that his mother "ask Monica." The [Petitioner] expressed concern for Ms. Harris' welfare and warned her that people on the porch were "going to shoot up the house."

Later that same afternoon, Ms. Harris was in front of the Armstrong residence talking to the victim. The [Petitioner] walked up behind her and told her to go home. She told the [Petitioner] to leave, but he again told her to go home. Ms. Harris testified that she "tussled with him, and he kind of threw [her], and then he shot [the victim]." Ms. Harris recalled seeing the gun in the [Petitioner]'s hand, heard the shot, and saw the victim fall onto the sidewalk. The people on the porch ran behind the house. Ms. Harris did not see a weapon either on the victim or on anyone who had been on the porch.

Ms. Harris was quite emotional. Her sister and others escorted Ms. Harris to her house. Ms. Harris did not know the [Petitioner]'s whereabouts. When police officers arrived to investigate, Ms. Harris told them what happened and gave a statement. The [Petitioner] never contacted Ms. Harris, and she had no contact with him until he was arrested.

On cross-examination, Ms. Harris admitted that she previously had problems with the victim, who also was the father of her daughter's child. The victim had been so disrespectful that Ms. Harris once summoned police officers to escort her daughter from the residence. After her daughter was out of the house, Ms. Harris had no further problems with the victim. Ms. Harris had discussed with the [Petitioner] the problems she had encountered with the victim. Ms. Harris agreed that the [Petitioner] was "very protective" toward her, and she believed that the [Petitioner] was trying to protect her the day of the shooting.

Dr. Cynthia Gardner testified that she performed the autopsy on the victim. The victim died from multiple gunshot wounds, including two bullets that entered the rear of the head. Two bullets entered the left side of the neck and exited the front of the neck, and the trajectory of two other neck wounds was from front to back. Three additional wounds had chest entry points. In all, Dr. Gardner located 13 individual wound tracks.

Memphis Patrol Officer Derrick Blake responded to the scene of the shooting at approximately 1:30 to 1:40 p.m. He discovered the victim's body, riddled with bullet holes, on the walkway with the head facing toward the house. No weapons were in the area. Officer Blake believed the victim was still breathing at the time. He interviewed Ms. Harris, who was cooperative and provided the [Petitioner]'s name as a suspect. Officer Blake issued a broadcast for the [Petitioner]. Sergeant Cynthia Donahue with the Des Moines Police Department arrested the [Petitioner] on February 25, 2003, in Des Moines, Iowa. At that time, the [Petitioner] identified himself as Mario Brown. Later, he did provide his correct name and told the officer that he "was wanted out of Tennessee for murder."

Larry Wing was present at 728 Lucy Street when the shooting occurred. Mr. Wing lived at the residence with Ms. Armstrong. He testified that Ms. Armstrong's sons and several of the sons' friends were sitting on the porch. Mr. Wing was inside the house preparing to go to work, and when he left the house, he walked to the truck parked in front of the residence. The driver of the truck worked with Mr. Wing, and he told Mr. Wing that a man had a gun. When Mr. Wing turned around, he saw the [Petitioner] shooting at the victim. The victim was standing in the yard and then fell to the ground. Mr. Wing saw and heard the defendant shoot at the victim multiple times.

Mr. Wing testified that when he came out of the house, he noticed Ms. Harris standing outside the gate talking to the victim. He did not detect any loud voices, and he did not see any weapons other than the [Petitioner]'s firearm. Through cross-examination, the defense established that Mr. Wing could not identify the shooter when he was questioned by the police. Mr. Wing explained at trial that his back was to the porch when the driver alerted him about the man with a gun. When Mr. Wing turned around, he saw the shooter's back. As the shooter continued firing, Mr. Wing began backing up, and when the shooter turned to leave, Mr. Wing went across the street.

Laquavious Armstrong, who also was present at the time of the shooting, testified that he, Tony Redmond, Lavon Armstrong, Eddie Armstrong, and Kevin Farmer had been sitting on the porch "smoking a little marijuana." The [Petitioner] walked up and asked the victim for a ride. When the victim declined, the [Petitioner] got "mad," the men had a "few words," and the [Petitioner] left. Laquavious

Armstrong next saw the [Petitioner] and the [Petitioner]'s girlfriend circle the block in a truck a couple of times. The [Petitioner] waved a gun out of the truck window. The third time the truck came around the block the [Petitioner] was not inside riding.

Laquavious Armstrong said he spotted the [Petitioner] on the side of the house, but before anything could happen, the [Petitioner]'s mother arrived. The [Petitioner] spoke to his mother, after which his mother walked toward the porch and "called [the victim] out to the gate." The [Petitioner]'s mother wanted to know why the two men were arguing, and the victim explained that the argument related to a car. Laquavious Armstrong overheard the [Petitioner]'s mother remark, "[W]ell, he can't get mad over nothing that ain't his." Laquavious Armstrong never observed the victim being disrespectful to Ms. Harris; nor did he observe any weapons on the victim or anyone else on the porch.

Laquavious Armstrong then described what happened when the [Petitioner] walked up to Ms. Harris.

> A: Well, when he got up there, he was like, "Momma, get away from those bitch-ass n******. I'm fixing to kill this n*****," you know what I'm saying, like that there.
>
> Q: Who said that?
>
> A: That's what [the Petitioner] said.
>
> Q: All right.
>
> A: And so his momma was like, "No, go on to the house go on to the house." She grabbed him by the arm. He broke loose and just lunged out, just wide out.
>
> Q: Then what happened?
>
> A: After she tried to hold his arm, he broke loose from her and ran up on LaVon and shot him two times. He fell....
>
> . . . .
>
> Q: All right. Once he fell on the ground, what did [the Petitioner] do?
>
> A: Well, Mr. Harris he walked up over him and stood over on him and just kept on shooting. By then, you know, I'm running for my life.

On cross-examination, Laquavious Armstrong admitted that he joined in the verbal fray after the [Petitioner] walked up and told his mother to leave.

After Laquavious Armstrong's testimony, the state rested. The defense called LaShaun Lee, who lived next door to Earma Harris at the time of the shooting. Prior to the shooting, Ms. Lee had an occasion to witness a confrontation between the victim and Ms. Harris. Ms. Lee testified that the victim was being disrespectful to Ms. Harris.

Ms. Lee was present on June 8 and saw the [Petitioner] walk up to his mother, who was talking to the victim. Ms. Lee denied that the [Petitioner] tried to pull his mother away from the victim's house; rather, Ms. Lee saw Ms. Harris trying to pull the [Petitioner] back from the victim and telling him to come back toward their house. On cross-examination, Ms. Lee testified that she saw the [Petitioner] shoot the victim. She claimed that her memory of the specifics of the shooting was vague, however, because she wanted to get away from the gunfire.

The [Petitioner] took the stand, and he began his testimony by acknowledging that he had previously pleaded guilty to two prior drug offenses, two felony theft offenses, and robbery. Regarding the offense on trial, the [Petitioner] said that earlier in the day he became concerned for his mother's safety because of threats to "shoot up" her house and shoot her. When he went to check on his mother, he saw her down the street talking to the victim; the [Petitioner] claimed that the pair appeared to be arguing. The [Petitioner] testified that his "reason for going down the street was to tell [his] mom to come back home to her house." He even pulled on her to get her moving.

The [Petitioner] admitted shooting the victim. He explained his actions in the following terms:

> What made me pull my weapon out was guy by the name Antonio Redmond, he pulled his weapon first, and the first shot came from the porch, which I pointed my weapon, and I was in the street behind the truck . . . , me and my mom, and once he pointed his weapon, I mean, it was a heated argument, which Eddie started and Laquavious joined in, and [the victim] walked toward the porch and when he came off the porch – I mean when they pointed their weapon at me, I took my weapon out of my waist, and when the shot went off, I had pushed my mom in fear that she would be shot.

The [Petitioner] said that his firearm held six shell casings, and he fired all six bullets. He then ran off to escape the "mess of gunfire."

On cross-examination, the state closely questioned the [Petitioner] to identify the source of the conflict with the victim. Because the [Petitioner] had told his mother at the fish market that he and the victim "had been into it," the state wanted the [Petitioner] to elaborate. The [Petitioner] denied that he argued with the victim about an automobile. He gave a somewhat rambling account to the effect that after the victim declined to drive the [Petitioner] home, the [Petitioner] called his sister and asked her to call and tell the victim that he should allow the [Petitioner] to borrow the car briefly to drive home and change clothes. When the [Petitioner] again called his sister to check on her progress, she advised that no one had answered the telephone when she tried to reach the victim. The [Petitioner] told his sister that the victim and the victim's cousin were standing on the house porch. The [Petitioner] said that he told his sister not to "worry about it," because he would call his "baby's momma" and arrange for transportation.

According to the [Petitioner], he then walked to the store, and on his way back from the store, the victim ran out of the house. The [Petitioner] pinpointed that moment as the beginning of the altercation. He testified that the victim started screaming, "[W]hat the 'F' you mean you going to get at me and what you done told your sister." At some point, some of the other people on the porch "joined in," and the [Petitioner] said that he told the victim that he was going to call his child's mother to get a ride.

As for the firearm, the [Petitioner] testified that he had been carrying it all the time, even though he knew it was illegal because he is a convicted felon. He denied, however, waving a gun outside the truck window as he and his girlfriend drove along Lucy Street. The [Petitioner] admitted shooting the victim but denied firing at the back of the victim's head. The [Petitioner] surmised that the men shooting from the porch hit the victim from behind. The [Petitioner] also disputed the witness testimony that he stood over the victim and fired shots after the victim had fallen to the ground.

Harris, 2005 WL 468324, at *1-4.

The Petitioner's first hearing on his petition for post-conviction relief occurred on June 5, 2008. The Petitioner first called his trial counsel to testify. Trial counsel, a Shelby County Assistant Public Defender, was appointed to represent the Petitioner at trial.[1] She could not recall how many times she visited with the Petitioner during her representation of him, but she said it was not more than fifteen times. She recalled that the Petitioner had a lot of witnesses against him, including his own mother, and that his chances of success at trial were therefore slim. Upon hearing the Petitioner's claim that Antonio Redmond had a gun, however, trial counsel attempted to develop a

---

[1] Another Shelby County Assistant Public Defender also represented the Petitioner, but did not testify at his post-conviction hearing and appears to have played a smaller role in the Petitioner's defense.

theory of self-defense. To that end, she reviewed discovery and interviewed witnesses present at the scene, but she was unable to uncover any evidence or potential testimony supporting the Petitioner's theory. In particular, no witness supported the Petitioner's claim that Mr. Redmond or any other individual on the porch had a gun, although the Petitioner's mother noted that she may have been too focused on the Petitioner to notice anyone else holding a weapon.

After refreshing her memory using the Petitioner's trial transcript, however, trial counsel admitted that she did not cross-examine Dr. Gardner regarding the victim's bullet wounds. Trial counsel did not remember why she chose not to do so. She also remembered that Dr. Gardner had testified that all of the victim's wounds appeared to have been inflicted by bullets fired from more than two feet away. Trial counsel also said that she believed she would have advised the Petitioner not to testify at trial.

The Petitioner testified on his own behalf at his post-conviction hearing. He said that trial counsel visited him only twice, with both visits occurring in jail, and that trial counsel never discussed his case in detail with him. The Petitioner told trial counsel about Antonio Redmond and described the gun he said Mr. Redmond had at the time of the shooting. The Petitioner believed trial counsel never spoke to Mr. Redmond, who was in jail on an unrelated charge at the time the Petitioner was tried. The Petitioner wanted trial counsel to call Mr. Redmond as a witness; he testified that trial counsel said she would call Mr. Redmond to testify, but she never did. The Petitioner also said that he urged trial counsel to interview Kevin Farmer, who, although he was present on the porch at the time of the Petitioner's crime, was unrelated to the other witnesses. The Petitioner therefore believed Mr. Farmer would tell the truth.

Trial counsel also impressed upon the Petitioner that a self-defense claim was not an option for him because he had "over-killed" the victim by shooting him thirteen times. The Petitioner said that he shot the victim only six times, as he had been carrying a revolver with a six-round capacity, and that someone else must also have shot the victim from the porch. Police had never recovered the Petitioner's weapon, however. Finally, the Petitioner said that he had not wanted to testify because he was concerned about making his criminal record known to the jury; he chose to testify, however, because trial counsel insisted that he tell his side of the story.

Trial counsel had left the hearing by the time the Petitioner finished testifying. The State recalled her as a rebuttal witness, however, in a July 1, 2008 continuation of the post-conviction hearing. Trial counsel testified that she had, in fact, spoken to Mr. Redmond on the Petitioner's behalf, but that Mr. Redmond had not offered any helpful potential testimony. She could not recall discussing anyone named Kevin Farmer. Trial counsel also noted that there had been no forensic evidence of shots being fired from the porch on which Mr. Redmond and others sat, other than shots fired by the Petitioner.

The post-conviction court denied the Petitioner relief in an order dated August 29, 2008. The Petitioner now appeals.

**Analysis**

To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58 (1985). The prejudice component is modified such that the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; see also Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as

of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

The Petitioner's sole argument on appeal is that the post-conviction court's denial was error because trial counsel failed to cross-examine Dr. Gardner at trial regarding the thirteen unique bullet paths she identified in the victim's body. He contends that this failure fell below an objective standard of reasonableness because "[w]hen the evidence shows that the Petitioner fired six shots, but the victim was shot thirteen or fourteen times, it should be clear that someone else was shooting."

In order to demonstrate that he was prejudiced by trial counsel's failure to cross-examine Dr. Gardner on this point, however, the Petitioner would first have to show by clear and convincing evidence that he fired only six shots. The Petitioner's weapon was never recovered, however, and the post-conviction court apparently chose not to credit the Petitioner's testimony that he killed the victim with a six-shot revolver. The Petitioner also did not present any other testimony at his post-conviction hearing tending to independently establish that someone else also shot the victim or that cross-examining Dr. Gardner would have been beneficial in some way.

We cannot conclude that the post-conviction court erred in finding that the Petitioner failed to prove his factual allegations by clear and convincing evidence. We therefore affirm the post-conviction court's holding that the Petitioner failed to show either prejudice or deficient performance by trial counsel.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the Shelby County Criminal Court's denial of post-conviction relief.

_____
DAVID H. WELLES, JUDGE